UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DOROTHY ASHER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-3058** |
| **MICHAEL J. ASTRUE,**<br>**COMMISSIONER OF SOCIAL**<br>**SECURITY ADMINISTRATION** | **SECTION "C" (3)** |

### REPORT AND RECOMMENDATION

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner denying her application for widow's insurance benefits under Title II of the Social Security Act ("SSA") and her application for supplemental security income ("SSI") payments under Title XVI of the SSA. The matter has been fully briefed on cross-motions for summary judgment and is ripe for review. For the following reasons, IT IS RECOMMENDED that plaintiff's motion for summary judgment be DENIED, the Commissioner's cross-motion be GRANTED, and plaintiff's case be DISMISSED WITH PREJUDICE.

### I. Procedural and Factual Background

*Procedural History*

On June 9, 2006 and March 26, 2008, plaintiff filed applications for disabled widow's benefits and supplemental security income benefits, alleging a disability onset date of August 1,

1

1998. (Adm. Rec. 142, 437). The agency denied plaintiff's applications for benefits, and she requested a hearing. (Adm. Rec. 44, 48, 439). A hearing was conducted on September 24, 2007, and the Administrative Law Judge ("ALJ") issued a written decision on January 18, 2008, denying plaintiff's application for SSI benefits. (Adm. Rec. 35-43). Pursuant to plaintiff's request for review of the hearing decision, the Appeals Council remanded the matter to the ALJ with instructions to obtain evidence clarifying the effect of the assessed limitations on plaintiff's occupational base, to consolidate plaintiff's disabled widow's benefits claim and to issue a new decision as to both applications. (Adm. Rec. 26-27).

On May 1, 2009, the ALJ conducted a hearing on remand. Plaintiff, represented by counsel, appeared and testified. (Adm. Rec. 451). Additionally, vocational expert Ms. Kelly Hutchins appeared and testified that plaintiff's limitations would not erode the occupational base of "unskilled work" at any exertional level, including the light level. (Adm. Rec. 461). Plaintiff's counsel did not question the vocational expert. (*Id.*) On May 28, 2009, the ALJ issued his decision on remand, finding that claimant had the capacity to perform the full range of light *unskilled* work and denying plaintiff's applications for disabled widow's and SSI benefits. (Adm. Rec. 23-24).

> The ALJ concluded:
>
> Since the claimant had the capacity to perform the full range of light unskilled work, a finding "disabled" is directed by Medical-Vocational Rule 202.17 and Rule 202.10.
>
> The remand is occasioned by my failure to secure a vocational expert to testify as to the existence of jobs that can be performed by one who cannot carry out detailed or complex job instructions.
>
> In this regard, the vocational expert in the remand hearing testified that limitations to simple instructions with no detailed or complex instructions do not reduce the

UNSKILLED occupational base at any exertional level including light.

The expertise of the vocational expert is recognized by the Commissioner's having selected her as an expert witness. The vocational expert provided testimony that disagrees with the conclusion of the Appeals Council that the residual functional capacity the undersigned found resulted in "significant nonexertional limitations." The expert's testimony, however, is in accord with regulations and rulings that promulgate the medical vocational grid, *viz.,*

20 CFR 404, Subpart P, App. 2, section 202.00(a) envisions UNSKILLED jobs, in that it provides:

> "Approximately 1600 separate sedentary and light <u>unskilled</u> occupations can be identified in eight broad categories, each occupation representing numerous jobs in the national economy. There jobs can be performed <u>after a short demonstration or within 30 days</u>, and do not require special skills or expertise (emphasis added)."

Thus, regulations establishing the grids eliminate any detailed or complex job instructions for consideration for the occupational base contemplated by the grids. SSR 83-10 and SSR 83-11 provide that the grids apply in cases where the person is able to perform unskilled work and is not dependent on an ability to perform detailed or complex job instructions.[1]

Plaintiff requested review of the determination on remand. (Adm. Rec. 4). The Appeals Council received additional evidence: (1) Claimant's Counsel's Letter dated February 1, 2009 (AC-1/Adm. Rec. 446-447);[2] and a (2) Residual Functional Capacity ("RFC") Questionnaire executed by Dr. James Dyess on June 29, 2009 (AC-2/Adm. Rec. 448-450). (Adm. Rec. 7). On July 22,

---

[1] ALJ Charles C. Pearce's May 28, 2009 Decision (also noting that the residual functional capacity determined at the pre-remand hearing contained the redundancy "unskilled" work that did not require "detailed or complex" job instructions) (Adm. Rec. 23-24).

[2] In his letter to the Appeals Council, counsel argued that anautomobile "accident which occurred on October 18, 2007 altered claimant's RFC to sedentary or less as per Dr. Dyess's statement" and "concede[d] that prior to the accident of October 18, 2007, the ALJ was generally correct in his assessment of [plainitff's] condition." (Adm. Rec. 447).

2010, the Appeals Council denied plaintiff's request for review, stating that:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed order of the Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Adm. Rec. 4-5).

Plaintiff timely appealed to the district court, and this matter is now ripe for review.

*Medical History*

Here, plaintiff provided treatment records from April 2000 to April 6, 2009. Additionally, plaintiff submitted a preprinted residual functional capacity questionnaire executed on June 29, 2009 by her treating internist, Dr. James M. Dyess. His RFC assessment essentially precludes all gainful employment after October 18, 2007,[3] stating, *inter alia*, that plaintiff must recline frequently and is limited to no more than two hours of work per day, noting only muscle spasms, spinal deformity and cervical/lumbar disc herniations as noted on the patient's MRIs. (Adm. Rec. 448-450).[4] The aforesaid RFC statement must be viewed in light of the entire medical record discussed below.

Plaintiff's work history is sparse, having only worked as a "tomato grader" from 1980 to 1981 and as a hotel housekeeper for one month in 1998,[5] when she purportedly stopped working due

---

[3] *See* RFC Questionnaire executed by Dr. Dyess on 6/29/2009 (remarking that "I would have allowed more activity prior October 18, 2007 "). (Adm. Rec. 450).

[4] *See also* Plaintiff's Statement to the Office of Disability Services dated 4/ 29/2008 (essentially limiting herself to no work after an October 17, 2007 car accident and similarly stating her condition "has gotten worse"). (Adm. Rec. 195).

[5] *See* Work History Report (Adm. Rec. 156).

to numbness of the legs and migraine headaches.[6]

On March 7, 2001, Dr. Gustavo A. Gutnisky performed a lumbar laminectomy at L4-5 and L5-S1 and a partial discectomy of the L4-L5 on the right. (Adm. Rec. 250). Thereafter on August 28, 2001, Dr. Gutnisky performed a lumbar myelogram study and reported disc bulges at the L3-4, L4-5 and L5-S1 levels and degenerative disc disease at the L4-5 level with some mild relative narrowing of the neural foramina bilaterally; however, the images showed no definite focal disc herniations and no definite findings of nerve root impingement. (Adm. Rec. 305). Myelogram studies of plaintiff's cervical spine performed the same date showed: (1) "moderate narrowing" at C3-4 with "[n]o significant degree of central spinal canal stenosis;" (2) "mild focal central bulging" at C4-5 with "no significant degree of central spinal stenosis;" (3) a right paracentral spur compressing the spinal cord and degenerative changes with some "mild relative narrowing of the neural foramina" and mild underfilling of the right C5-6 nerve root sheath;" (4) a broad-based posterior spur effacing the central thecal sac and abutting the spinal cord but "no significant cord compression" and only "mild narrowing of the right neural foramina;" and (5) the C7-T1 level appeared "unremarkable." (Adm. Rec. 302).

Dr. Gutnisky's treatment notes reflect that plaintiff was limited to part-time light duty work in 2001. After three years of treatment in March of 2004, he opined that plaintiff could perform light-duty work full time.[7]

---

[6] *See* Disability Report (Adm. Rec. 149-150).

[7] *See* Dr. Gutnisky's Treatment Notes (stating as of 3/29/2004 that "I do believe that the pt could do full-time light duty work, in other words, she could work 8 hrs/day as long as she is restricted to light duty work"). (Adm. Rec. 301).

On August 25, 2006, plaintiff presented for a consultative examination performed by Dr. Ahmad A. Haider. Plaintiff then reported that her neck and back pain was severe – 7 or 8 on a 10-scale – and "constant," meaning "all day long." (Adm. Rec. 320). Asher also stated that she smokes "one and a half packs of cigarettes a day" and that her "[m]other died at age sixty-five with throat cancer." (*Id*.)  Dr. Haider found that the plaintiff exhibited normal range of motion at the shoulders, elbows and wrists along with normal manual grip and dexterity. Plaintiff also exhibited normal range of motion of the lower extremeties, hips, knees and ankles. Despite a positive right straight leg at 45 degrees, plaintiff was able to walk on tiptoes and heels, squat and bend forward with fingertips approximately 14 inches from the floor. Moreover, her gait was normal. Additionally, Dr. Haider noted that plaintiff neither used nor required any assistive device for ambulation. He further commented that, neurovascularly, the patient was intact. (Adm. Rec. 320-321). The scoliosis study ordered by Dr. Haider showed an "S shaped curvature of the spine," more significant in the lumbar spine with 30 degrees of dextroscoliosis and moderate degenerative changes from L3 to S1. (Adm. Rec. 322).

On October 21, 2007, Asher was treated in the emergency room of Highland Community Hospital in Picayune, Mississippi, reporting that she was involved in an automobile accident on October 18, 2007 in Slidell, Louisiana. Emergency room discharge notes state that Asher ambulates without difficulty, voiced no complaints and was discharged in no acute distress. (Adm. Rec. 365). The Emergency Department Physician Medical Record indicates that plaintiff went to the hospital on the day of the accident but left without being seen. (Adm. Rec. 366, 368). The review of systems showed "no significant abnormalities," with the exception of plaintiff's complaints of neck and back

pain. Upon physical examination, plaintiff appeared to be in no apparent distress and her general appearance was normal. (Adm. Rec. 366). There was only "moderate" muscle spasms in the neck and back and there was "no tenderness." (Adm. Rec. 367). Neurologically, there was "no focal weakness" and all extremities were "equal bilaterally," and she moved "without difficulty." (*Id.*) Plaintiff was discharged in "good condition." (*Id.*).

Thereafter, on October 29, 2007, plaintiff reported for treatment to an internist, Dr. James Dyess, who in turn reported to Asher's attorney, Michael Hingle. (Adm. Rec. 395). Dr. Dyess's examination of plaintiff's bilateral upper and lower extremities revealed "no bony abnormalities" and "good movement over all joints." (Adm. Rec. 396). His neurological examination revealed "no sensory deficits in the upper and lower extremities," "motor strength 5/5 throughout" and "deep tendon reflexes were 2+ and equal bilaterally." (*Id.*) Additionally, the straight leg raising test was "negative bilaterally revealing no nerve stretch symptoms." (*Id.*). Plaintiff exhibited limited range of motion of the cervical and lumbar spine reportedly due to pain, which continued throughout her follow-up visits with Dr. Dyess. (Adm. Rec. 383-410).

On November 15, 2007, William P. Osborn, Ph.D., conducted a comprehensive mental status evaluation of plaintiff. He observed that plaintiff's only hospitalization in the recent past was for back surgery in the year 2000. (Adm. Rec. 332). Dr. Osborn saw nothing about plaintiff that would require the situation she has in place – *i.e.*, she lives with a male friend but has her daughter over every day to do all of the household chores. Simply stated, he saw no reason why plaintiff and her live-in boyfriend could not handle the household chores. Dr. Osborn noted that plaintiff has friends and relatives over more than three times a week, watches 14 hours of television daily, drives, goes

to social functions with her family and her romantic friend and even travels well. (Adm. Rec. 333). A review of her activities further revealed that Asher is capable of handling household money, paying the bills and making financial decisions. Dr. Osborn further reported that plaintiff stated that she does all of the shopping, performs routine grooming/personal hygiene activities on her own, cares for a dog and cat and appears to be able to perform household chores, but does not do so. (*Id.*). Dr. Osborn further opined:

> DIAGNOSES: Information available on [plaintiff] appears consistent with the following DSM four categories:
> AXIS I:    Adjustment Disorder with Mixed emotional features. I think this is probably a grief situation.[8]
> AXIS II:   There must be some personality factors present in that she does a whole lot of things but she claims she does not do any household chores. This is interesting in that she can go shopping and do other things that she says she does but she is unable to do chores.
> AXIS III:  She reports some back, neck and leg problems and headaches.
> AXIS IV:   The findings in this evaluation indicate that [plaintiff], mentally, can perform routine repetitive tasks and interact with her co-workers, receive supervision and maintain concentration and attention. She presents with sufficient math skills and intellect to handle her own funds.

(Adm. Rec. 334). Most notably, Dr. Osborn observed that plaintiff appeared for the evaluation well-groomed, oriented and that "her gait and posture were normal." (Adm. Rec. 333).

Plaintiff continued treatment with her internist (Dr. Dyess). He referred her for another MRI, which was conducted on June 2, 2008. (Adm. Rec. 379). The MRI study of the lumbar spine

---

[8] Plaintiff told Dr. Osborn that both her husband and her father passed away during the last year. (Adm. Rec. 334).

showed that there was narrowing at L3-4, L4-5 and L5-S1 levels, with moderate disc protrusion at the L5-S1level, causing minimal to moderate spinal canal stenosis.  At the L4-5 level, there was minimal to moderate disc protrusion causing minimal to moderate spinal canal stenosis.  At the L3-4 level there was moderate left disc protrusion causing moderate to severe spinal canal stenosis. (Adm. Rec. 381-382).  MRI studies of the cervical spine showed: (1) post-traumatic myelomalacia and a large disc herniation at the C6-7 level; (2) minimal disc herniation at C7-T1; (3) mild central disc bulging at C5-6 along with post-surgical fusion; and (4) mild neural foraminal disc bulging at C4-5.  (Adm. Rec. 379-380).

On November 10, 2008, plaintiff was evaluated by a neurologist, Dr. Kenneth E. Vogel. Although plaintiff related cervical and right arm pain plus numbness, lumbosacral bilateral hip and right leg pain plus numbness and "burning and stabbing" leg pain, Dr. Vogel's "[e]xamination revealed a 51 year-old patient in no acute pain." (Adm. Rec. 422).  His cervical spine examination revealed only "a mild degree of limitation of motion" and the lumbosacral examinations showed a moderate degree of muscle spasm and limitation of motion.  Dr. Vogel recommended continuing conservative care, including physical therapy. (Adm. Rec. 423).

On follow-up examination with Dr. Vogel on December 4, 2008, a cervical spine examination of the plaintiff revealed only a mild degree of limitation of motion and muscle spasm. Dr. Vogel's motor examination of plaintiff was normal, with the exception of grip strength.  The lumbosacral examination revealed only a mild degree of limitation of motion, moderate muscle spasm and mild scoliosis on the left.  Dr. Vogel reported that plaintiff's motor examination was limited by pain, and her sensory examination was normal.  He further reported that the patient

declined definitive care/surgery. (Adm. Rec. 419).[9]

Plaintiff continued in the conservative care of Dr. Dyess through April 6, 2009, complaining of neck, back and shoulder pain and reporting that all of her related symptomotology had increased; for example, plaintiff complained of decreased range of motion with pain and "stabbing pains in bilateral 1st toes." (Adm. Rec. 412-413).

On June 29, 2009, Dr. Dyess completed the RFC questionnaire sent to him by plaintiff's counsel, indicating that plaintiff is unable to engage in any gainful employment because of muscle spasms, spinal deformity and herniated cervical/lumbar discs. (Adm. Rec. 448-449). The questionnaire is a check-off form and does not indicate that plaintiff appeared in person for an RFC evaluation; Dr. Dyess's RFC statement appears to be based solely on his past clinical examinations of plaintiff and a review of her January 2, 2008 MRI results.

## II. Standard of Review

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards to evaluate the evidence. *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). If the Commissioner's findings are supported by substantial evidence, this Court must affirm them. *Martinez*, 64 F.3d at 173.

---

[9] *See also* Dyess Medical Center Follow Up Visit Notes dated January 12, 2009 (reporting that "Patient does not want any surgery") (Adm. Rec. 418); Dr. Dyess January 13, 2009 Report to Attorney, Michael Hingle (same). (Adm. Rec. 417).

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. (1992). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Carey*, 230 F.3d at 135. Any of the Commissioner's findings of fact that are supported by substantial evidence are conclusive. *Ripley*, 67 F.3d at 555. Despite this Court's limited function on review, the Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

### III. Entitlement to Benefits under the Act

To be considered disabled and eligible for disability benefits under the Act, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant, such as the plaintiff, is considered disabled only if her physical or mental impairment is so severe that she is unable to do not only her previous work, but cannot, considering her age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which she lives, whether a specific job vacancy exists or whether she would be hired if she applied for work. 42 U.S.C. § 1382(a)(3)(B). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501-404.1599 & Appendices, §§ 416.901 t-416.988 (1995). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. *Id*. §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

In *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001), the Fifth Circuit restated the five-step procedure to make a disability determination under the Social Security Act:

> The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment

> must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Shave,* 239 F.3d at 594 (quoting *Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)). If the ALJ determines that a plaintiff is not disabled under Step V of the five-part test, as he did here, the ALJ must establish that the claimant has a "residual functional capacity," given the claimant's age, education, and past work experience, to perform other work available in the national economy. *Leggett v. Chater*, 67 F.3d 558, 564, n. 11 (5th Cir. 1995). Step V also requires the Commissioner to use the medical-vocational guidelines to make his disability determination. *Id*.

The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." *Id.*

## IV. Issue on Appeal

The only issue raised by plaintiff is whether "substantial evidence" supports the Commissioner's final administrative decision and whether the Commissioner's decision comports with the relevant legal standards. More particularly, plaintiff claims that the "Commissioner failed

to consider, weigh and explain the weight given to the opinions of claimant's treating physician."[10]

## V. Analysis

The ALJ must follow the guidelines set forth in Social Security Report ("SSR") 96-2p to determine whether "controlling weight" should be given the *medical* opinions of a "treating source." These guidelines are that: (1) the opinion must come from a "treating source"; (2) the opinion must be a "medical opinion"; (3) the treating source's medical opinion must be "well supported" by "medically acceptable" clinical and laboratory techniques; and (4) even if supported, the opinion must not be inconsistent with other substantial evidence. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). Even if the ALJ finds that the treating source's medical opinion is not entitled to controlling weight, that does not mean that the opinion can be rejected. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." SSR 92-2p.

The factors in 20 C.F.R. §§ 404.1527 and 416.927 include: (1) examining relationship; (2) treatment relationship, length of treatment, frequency of examination, nature and extent of relationship; (3) supportability; (4) consistency; and (5) specialization. "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or

---

[10] *See* Plaintiff's Memorandum in Support of Motion for Summary Judgment at pp. 12,17 (arguing that the "RFC assessment" by Dr. James Dyess, "was not considered and evaluated in accordance with the mandate of 20 C.F.R. 404.1527(e) and SSR 96-5p" and therefore remand is warranted) (Rec. Doc. 21-1).

diagnostic techniques, or is otherwise unsupported by the evidence." *Shave v. Apfel*, 238 F.3d 592, 595 (5th Cir. 2001); *Newton*, 209 F.3d at 456. Medical opinions of a specialist are generally accorded more weight than opinions of a source not a specialist. *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990). However, specialization is only one of several factors considered in the evaluation of medical opinions. In summary, the Commissioner has considerable discretion in assigning weight to medical opinions and is free to reject the opinion of any physician when substantial evidence supports a contrary conclusion. *Martinez*, 64 F.3d at 176; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); *Moore*, 919 F.2d at 905. Indeed, even when a court should afford considerable weight to a treating physician's *medical* diagnosis, the "ALJ has sole responsibility for determining a claimant's disability status." *Newton,* 209 F.3d at 455 (citing *Greenspan*, 38 F.3d at 237).

The main problem with plaintiff's argument here is that whether Dr. Dyess determined plaintiff to be "disabled" is of no moment. Such conclusions intrude on an area specifically reserved to the Commissioner, and the ALJ may reject such an opinion without referring to the factors used to evaluate a typical *medical* opinion. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir.2003) (*on reh'g*). Indeed, it is the Commissioner's (and not the treating physician's) duty to determine the plaintiff's RFC and to what extent, if any, she is disabled. SSR 96-5p. Such conclusions by plaintiff's internist are entitled to little – if any – weight.

Moreover, the Court finds that the ALJ's conclusions are supported by substantial evidence. The record reflects that the ALJ considered the entire record, including medical evidence pre-dating plaintiff's October 18, 2007 automobile accident. (Adm. Rec. 18-19). These medical records reflect

similar clinical findings but conclusions that vary to some extent. For instance, there are inconsistencies between the findings of Dr. Dyess in his RFC statement and the evidence in the record and even internal inconsistencies in Dr. Dyess's own findings upon physical examination of plaintiff. It is the duty of the Commissioner – and not this Court – to resolve inconsistencies in the record. *Carey,* 230 F.3d at 135.

This Court further notes that there is also language in the ALJ's decision that questions plaintiff's credibility with respect to her "statements concerning the intensity, persistence and limiting effects of these symptoms" to the extent that they are inconsistent with the ALJ's RFC assessment. (Adm. Rec. 21). In this regard, the ALJ specifically noted the alleged onset date of August, 1998 vis-a-vis the absence of routine treatment pre-dating the automobile accident in 2007. Additionally, the ALJ highlighted that, even post-accident, Asher's daily activities were consistent with the ability to perform a range of light work. (Adm. Rec. 22).

SSR 96-7p, entitled "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," outlines the determination of a claimant's credibility.[11] "[A]n individual's statement(s) about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. To evaluate an individual's credibility, the adjudicator must first determine whether the claimant has an impairment that could cause the alleged symptoms, and such impairment must be demonstrated by medically acceptable

---

[11] The Fifth Circuit has noted that while they are not binding, SSRs "may be consulted when the statute at issue provides little guidance," and that the court itself has "frequently relied upon the rulings in evaluating ALJs' decisions." *Myers,* 238 F.3d at 620.

clinical and laboratory diagnostic techniques. *Id*. Second, if the claimant's statements about "the intensity, persistence, or functionally limiting effects of pain or other symptoms" are not substantiated by objective medical evidence, "the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id*. The Fifth Circuit has held that the ALJ need not give subjective evidence precedence over medical evidence but that "a resolution of conflicts between the subjective evidence and the medical evidence should depend upon the ALJ's evaluation of the credibility of the claimant's complaints of pain." *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988).

Essentially, plaintiff argues that the evidence of the severity and persistence of her pain is present throughout the record post-dating her October 18, 2007 accident, in the form of her own statements and those of her treating physician, and that the Commissioner ignored same. This Court is not persuaded.

As noted above, the ALJ specifically found *after considering all of the evidence of record* that plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Adm. Rec. 21). Moreover, and as previously discussed at length, the ALJ considered all of the medical evidence of record, including the medical findings of both Drs. Vogel and Dyess and the June 2, 2008 MRI studies. (Adm. Rec. 21-22). Indeed, the ALJ provided far more than a conclusory statement as to plaintiff's credibility and the severity and persistence of her pain. The ALJ compared plaintiff's statements as to her pain and other symptomotology to the opinions of her treating physician, Dr. Dyess, and to the organic

17

findings throughout Asher's medical records. (*Id.*).

The ALJ fulfilled his duties under Fifth Circuit law and did not incorrectly analyze plaintiff's credibility. Here, the ALJ pointed to the conflict between the descriptions of plaintiff's physical symptoms and the descriptions contained in her medical records. *See Hollis*, 837 F.2d at 1385. Plaintiff asks this Court to re-weigh the evidence and reject the ALJ's findings, but such an exercise on judicial review is entirely inappropriate. "The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ, who has had an opportunity to observe whether the person seems disabled." *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir.1983) (citing *Laffoon v. Califano*, 558 F.2d 253, 255 (5th Cir.1977)). The ALJ is the proper fact-finder to assess a claimant's credibility since he "enjoys the benefit of perceiving first-hand the ALJ's claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n. 18 (5th Cir. 1994) ("We do not sit in *de novo* review nor may we re-weigh the evidence."). The choice that the Commissioner made here – to credit plaintiff's medical records and not her subjective complaints of debilitating symptoms – is supported by substantial evidence, and this Court may therefore not overturn it.

Finally, with respect to an alleged error by the Appeals Council, this Court disagrees. Unquestionably, the Appeals Council considered Dr. Dyess's RFC statement in light of the full medical record and correctly determined that the conclusory statement as to disability post-accident did not provide a basis for review of the ALJ determination. In *Carey v. Apfel*, 230 F.3d 131 (5th Cir. 2000), the Fifth Circuit rejected such an attempt to offer a doctor's RFC opinion as evidence of disability, when the doctor's opinion was based on the identical medical information and records

previously considered by the ALJ.[12]

## VI. Conclusion

Plaintiff has failed to show that the Commissioner applied an incorrect legal standard or that substantial evidence does not support the Commissioner's finding that plaintiff is not disabled within the meaning of the SSA. Accordingly,

**IT IS RECOMMENDED** that the plaintiff's Motion for Summary Judgment be DENIED, the Commissioner's Cross-Motion be GRANTED and that plaintiff's complaint be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within fourteen (14) days after being served with a copy of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b). A party's failure to object bars that party from: (1) entitlement to de novo review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 13th day of June, 2011.

---

[12] *See Carey v. Apfel*, 230 F.3d 131, 141, n. 1 (5th Cir. 2000) (noting that, assuming arguendo that the physician's 1997 conclusion that the claimant is disabled is relevant, its probative weight is minimal and does not undermine the ALJ's decision in this case, citing 20 C.F.R. § 220.46(d), and highlighting that "medical evidence provided by a treating physician will be considered," but a "statement by or the opinion of the claimant's treating physician will not determine whether the claimant is disabled").

_____
**DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE**